**Ronald SCHARF, et al., Respondents,**

v.

**Alexander KOGAN, et al., Appellants.**

**No. ED 91612.**

Missouri Court of Appeals, Eastern District, Division Three.

May 5, 2009.

Clyde C. Farris, Clayton, MO, for appellant.

Duane L. Coleman, St. Louis, MO, for respondent.

CLIFFORD H. AHRENS, Judge.

Alexander Kogan ("Mr. Kogan"), Phillip Kogan, IPD Sales & Marketing, LLC[1] ("IPD"), OOO Air Structures American Technologies and Investment ("Air Structures") (collectively the "Kogan Parties")[2] and Klaudia Kogan ("Mrs. Kogan") appeal from the judgment of the trial court confirming the arbitration award issued in the dispute between the Scharf Parties[3] and the Kogan Parties and Mrs. Kogan. Mrs.

---

**1.** In the Notice of Intent to Arbitrate, IPD is listed as an LLC, but in the brief of the Kogan Parties, it is listed as a corporation. The proper form of the business organization does not affect our decision.

**2.** The Kogan Parties do not include Klaudia Kogan.

**3.** The Scharf Parties consist of Ron Scharf, Tim Scharf, Johnson Marcraft, Inc., Airstructures Worldwide, Ltd., and Johnson Marcraft Airstructures Worldwide, Ltd.

Kogan contends that the trial court erred in confirming the arbitration award as to her and denying her motion to vacate the award because the arbitrator had no authority to enter an award against her. The Kogan Parties and Mrs. Kogan also claim that the trial court erred in confirming the arbitration award and denying their motion to vacate the award because of the arbitrator's denial of their request for a postponement of the arbitration hearing. We reverse in part and affirm in part.

Mr. Kogan, together with his son, Philip Kogan were in the business of making and selling fabricated domes, and were attempting to market these structures in Russia. Mr. Kogan controlled IPD, and created a subsidiary, Air Structures, to handle the Russian business, with the intent that Air Structures would build a plant in Russia to produce fabricated domes there. Needing funding, Mr. Kogan approached Ron Scharf ("Mr. Scharf") in 2005. Mr. Scharf owned Johnson Heater Corporation, the parent company of Johnson MarCraft, Inc. ("JMI"), which had provided some components for the fabricated dome industry. This resulted in several agreements and multiple documents being executed between February 1, 2005, and August 1, 2005. The Kogan Parties and the Scharf Parties entered into an agreement on February 1, 2005 ("February 2005 Agreement"), in which JMI provided $500,000 in funding to the Kogan Parties, and was appointed exclusive supplier of HVAC equipment to the Kogan Parties. Along with the February 2005 Agreement, the Kogan Parties executed a Promissory Note and Line of Credit and Security Agreement in favor of the Scharf Parties.[4]

Thereafter, the Kogan Parties and Scharf Parties entered into additional agreements. The agreement of May 3, 2005 ("May 2005 Agreement") called for the creation of a new firm, Air Structures World Wide Ltd. ("AWW"), to be owned sixty percent by Mr. Scharf and Tim Scharf and forty percent by Phillip Kogan. Phillip Kogan signed a stock subscription agreement at about that time as well. The May 2005 Agreement also provided for the creation of another company, Johnson Marcraft AirStructures World Wide ("JMAWW"), to be wholly owned by Ron Scharf or his assigns.[5] Under the May 2005 Agreement, the Kogan Parties would market fabricated domes in the so-called former Eastern Bloc countries, and the Scharf Parties would manufacture and market fabricated domes to the rest of the world.

The Kogan Parties still had financial issues throughout the summer of 2005, and sought more help from the Scharf Parties. The office building for the Kogan Parties, located at # 1 The Pines Court in St. Louis County, Missouri, had been subject to a judicial foreclosure, and the Kogan Parties asked the Scharf Parties for monetary assistance in redeeming # 1 The Pines Court. As part of the negotiations, the Kogan Parties and the Scharf Parties executed an Escrow Agreement (with Power of Attorney) dated July 25, 2005 ("Escrow Agreement"). The Escrow Agreement required that IPD and Mr. Kogan convey their interest in # 1 The Pines Court to the Scharf Parties by quit claim deed. On July 25, 2005, Mr. Scharf received a quit

---

4. The Promissory Note included "the spouse of Alexander Kogan" as an affiliate under that document. However, Mrs. Kogan did not sign the Promissory Note, and there was no space for her signature on that document.

5. The Kogan Parties and Scharf Parties agreed thereafter that JMAWW could be a division of JMI, which is what happened.

claim deed from IPD ("IPD Deed"), the record owner of that property, signed by Mr. Kogan in his corporate capacity, and also a quit claim deed signed by Mr. Kogan individually and by Mrs. Kogan ("Quit Claim Deed"). Although a power of attorney attachment to the Escrow Agreement stated that Mrs. Kogan was a party to it as an affiliate of the Kogan Parties, Mrs. Kogan did not sign it. The Escrow Agreement also incorporated a Sinking Fund Agreement. Both the Escrow Agreement and the Sinking Fund Agreement provided for arbitration, and expressly stated that in the event of arbitration, the parties waived any right they might otherwise have to appeal the arbitrator's decision.

The Kogan Parties and Scharf Parties had a number of disagreements and difficulties in their business relationship. On or about May 17, 2006, the Kogan Parties filed a Notice of Intent to Arbitrate with the American Arbitration Association ("AAA"), initiating arbitration proceedings against the Scharf Parties relating to those disagreements, seeking nominal monetary damages, but more significantly a declaration regarding the various agreements. The Scharf Parties filed their own Demand for Arbitration with the AAA against the Kogan Parties and Mrs. Kogan relating to the same set of agreements and the disputes associated with them, and seeking monetary damages in excess of $10,000,000. The AAA appointed an arbitrator on September 6, 2006, to arbitrate the dispute.

The Kogan Parties filed a Threshold Issues Memo with the arbitrator on October 20, 2006, arguing in part that the Scharf Parties had no legal right to seek arbitration under the Escrow Agreement due to their own actions. After consulting the lawyers for both the Kogan Parties and the Scharf Parties, the arbitrator issued Pretrial Order No. 3 on November 3, 2006, which set forth a discovery schedule for the parties and set the hearing date for the actual arbitration to begin on May 7, 2007. Pretrial Order No. 3 limited the depositions in the matter to those of Mr. Kogan and Mr. Scharf.

On February 21, 2007, the Kogan Parties filed a motion to extend the time: to file a motion to compel production of documents; to produce documents themselves; and to hear the Scharf Parties's motion to compel, citing a number of reasons including Mr. Kogan's absence due to a trip in Russia and counsel's workload. The motion also stated that counsel would be withdrawing from the matter effective February 23, 2007, and would be replaced by arbitration counsel, who was "getting up to speed" on the matter. The arbitrator issued Pretrial Order No. 5 on March 9, 2007, which ordered the Kogan Parties to produce a number of documents in response to the discovery requests of the Scharf Parties. On March 15, 2007, the Kogan Parties indicated that they refused to produce a number of documents that the arbitrator had ordered produced. The Kogan Parties filed a motion for continuance on March 30, 2007, asking the arbitrator to continue the hearing date from May 7, 2007, by at least three months. The Kogan Parties argued that the recent depositions of both Mr. Kogan and Mr. Scharf indicated that the evidence needed for the arbitrator hearing would have to be prepared differently, and that arbitration counsel would have to do unplanned work with engineers in Russia. The Kogan Parties also stated that their arbitration counsel needed time to understand the issues involved in the matter.

The arbitrator denied the request for a continuance in Pre–Trial Order No. 7 on April 16, 2007. The arbitrator set forth his rulings, in part, as follows:

1.1 This motion is denied. This matter has been pending for many months, and the trial date selected by agreement of the parties during consultation with the Arbitrator. The calendars of counsel and the Arbitrator have been set for months.

1.2 In addition, the matters stemming from the status of discovery are, ..., largely the result of discovery having been undertaken at the last, rather than the first, opportunity.

1.2.1 The fact that matters are learned in discovery that change plans for trial, or lead to the decision to pursue new and different discovery ought not come as a surprise to anyone. Put otherwise, that is what discovery is for—if the parties knew what discovery would reveal ahead of time, it wouldn't be "discovery" at all. All of this ought to have been completed long ago.

1.2.2 The fact that the Kogan Parties now want additional discovery does not compel a different result. The parties, upon entering into an agreement to arbitrate their differences, well knew that they would not be operating under the same rules of procedure as would have been the case in a judicial setting. In addition, the parties agreed to a certain deposition and discovery scheme well knowing, at a minimum, the general outline of the dispute and the general nature of the evidence needed to support their cases. The showing made by the Kogan Parties does not, ..., constitute good cause to deviate from that agreement and order thereon. In particular, it is the opinion of the Arbitrator that the matters set out in the motion were reasonably foreseeable when the agreements on discovery were made, and made with a view to keeping discovery costs in check. Nothing has changed.

1.3 The fact that Kogan has new counsel is, under all of the circumstances, not sufficient reason to change the date.

1.4 The remaining bases for the motion to continue the hearing date, and the responses thereto, have been reviewed, and none constitute good cause for continuing the hearing date.

The arbitrator held a hearing that lasted five days, from May 7, 2007 to May 11, 2007. The Kogan Parties and the Scharf Parties attended the hearing and presented evidence. Mrs. Kogan neither attended nor presented evidence. Instead, on the first day of the hearing, arbitration counsel made several oral motions, the second of which addressed Mrs. Kogan.

Arbitration counsel: Two, they brought claims against [Mrs.] Kogan and she's not a signator[y] or party to any contract. What she did do is sign a qui[t] claim deed that was put in escrow under the escrow agreement, but she wasn't a party to the escrow agreement, to the promissory note, to the security agreement, to the May 3rd agreement, etc., etc. So, I don't believe there's any authority over [Mrs. Kogan] not being a party to any of these agreements....

The arbitrator did not immediately rule on this oral motion.

On August 10, 2007, the arbitrator entered his award. In it, he awarded the lost profits requested by the Scharf Parties, which exceeded $16,500,000, as well as damages on several other grounds, includ-

ing damages based on the Sinking Fund Agreement and the Escrow Agreement. Regarding Mrs. Kogan, the arbitrator made a number of findings. He found that the Kogan Parties objected to the inclusion of Mrs. Kogan in the arbitration proceedings. The arbitrator discussed the evidence, and the lack thereof, and found that there was no evidence that Mrs. Kogan was an agent of the Kogan Parties, and no evidence beyond the wording of the agreements to indicate that she is liable, which he deemed insufficient, "with one exception[,]" upon which he made the following findings:

9.1 It is the finding of the Arbitrator based upon the documents presented, and the lack of any objection or evidence to the contrary, that the notarized signature on the [Quit Claim Deed] is in fact that of [Mrs.] Kogan, wife of [Mr.] Kogan. Indeed, had there been any issue of the validity of her signature or consent to that document, it ought to have been raised here, at a minimum in the context of allegations that the quitclaim deed she signed ought not have been recorded.

9.2 It is the further finding of the Arbitrator that there was no reason for that deed to have been signed except to comply with the terms of the Escrow Agreement. The execution of such a deed leads to the fair inference that she was aware of the reason for the need for the quitclaim deed, and that in executing it she was carrying out an obligation under that agreement. As a result it is reasonable to believe—and the arbitrator so finds—that she agreed to the terms of the Escrow Agreement and so indicated by executing the quitclaim deed. At a minimum, it was reasonable for the Scharf Parties to so believe.

10. It is therefore the ruling of this tribunal that there has not been a showing that [Mrs.] Kogan is a party to an agreement to arbitrate this dispute, with the sole exception of the Escrow Agreement, including its arbitration provisions, to which she is bound.

The arbitrator declared that the Sinking Fund Agreement and the Escrow Agreement are "in full force" and that the Scharf Parties did not materially breach them, and further, that the award binds the Scharf Parties, the Kogan Parties, and Mrs. Kogan. He ordered the Kogan Parties and Mrs. Kogan "to take all actions necessary to assist the Escrow Agent in effecting" the sale of the property located at #1 The Pines Court, and to take no action that would impede the sale of that property. In no other respect did the arbitrator bind Mrs. Kogan, or otherwise declare that she was subject to his authority.

On September 10, 2007, the Scharf Parties filed an application and motion to confirm the arbitration award in the Circuit Court of St. Louis County, Missouri. The Kogan Parties and Mrs. Kogan filed separate motions to vacate the arbitration award. The circuit court entered an order and judgment on June 16, 2008, which confirmed the arbitration award, save as to Phillip Kogan and IPD, and denied the separate motions to vacate filed by the Kogan Parties and Mrs. Kogan. The circuit court subsequently entered an order and judgment that confirmed the arbitration award as to Phillip Kogan and IPD. This appeal now follows.

 We must first address whether the Missouri Uniform Arbitration Act ("MUAA") or the Federal Arbitration Act ("FAA"), 9 U.S.C. section 1 *et seq.* 2000, governs the substantive law in this case.

Both sides concede that the result would be the same. The FAA applies to contracts affecting or involving interstate commerce. *Sitelines, L.L.C. v. Pentstar Corporation*, 213 S.W.3d 703, 705 (Mo.App. 2007). The phrase "involving commerce" is interpreted broadly, and is the functional equivalent of "affecting commerce." *McIntosh v. Tenet Health Systems Hospitals, Inc./Lutheran Medical Center*, 48 S.W.3d 85, 88 (Mo.App.2001). The FAA has been applied in cases where the contract merely relates to interstate commerce, even when the relationship was less than substantial, having no more than a "tangential [e]ffect on interstate commerce." *Id.* at 88–89. In the present case, where the agreements involve building fabricated domes in Russia, and where several such fabricated domes were actually built there, there is more than a mere tangential effect on interstate commerce. Accordingly, the FAA applies, and we must apply federal law. *Sitelines*, 213 S.W.3d at 706. However, Missouri procedural law applies, so long as the applicable Missouri procedures do not defeat rights granted by Congress. *Id.*

Before we address the merits of Mrs. Kogan's appeal, we must first examine our authority to hear her appeal. The Scharf Parties contend that this Court should dismiss Mrs. Kogan's appeal because the Escrow Agreement and Sinking Fund Agreement, which contain the agreements to arbitrate, both state that "[i]n the event of arbitration, the decision of the arbitrators shall be binding against all parties and the parties waive any right they otherwise may have to appeal such decision." The problem with this contention is that if there is insufficient evidence that Mrs. Kogan agreed to the terms of the Escrow Agreement and the Sinking Fund Agreement, or to support a reasonable inference that she so agreed, she is not bound by them, and hence could not have waived her right to appeal. Accordingly, we must determine whether there is sufficient evidence that Mrs. Kogan agreed to arbitrate, or that there is a reasonable inference that she agreed to arbitrate, and thus we must address the merits of her appeal.

■ In her first point relied on, Mrs. Kogan contends that the trial court erred in entering judgment confirming the arbitration award against Mrs. Kogan and denying her motion to vacate the award because the arbitrator did not have the authority to enter an award against her. She argues that she did not sign any agreement to arbitrate, or otherwise agree to arbitrate disputes with the Scharf Parties, and that she timely objected to the arbitrator's authority over her, and did not waive her objection. Mrs. Kogan asserts that the Quit Claim Deed relied on by the arbitrator as a basis for asserting authority over her did not establish that she agreed to arbitrate disputes relating to any agreements involving the Scharf Parties.

We note that the arbitrator found the Scharf Parties offered no evidence that Mr. Kogan had the authority to bind Mrs. Kogan, and that the arbitrator observed that her signature was only on the Quit Claim Deed, and that no one questioned Mr. Kogan on that issue. The arbitrator also stated that there was "no evidence at all" to show that Mrs. Kogan was an agent of the Kogan Parties. The arbitrator found "no evidence beyond the wording of the agreements to indicate that she is liable thereon," with the exception of the Quit Claim Deed, which he inferred she would have done only to comply with the Escrow Agreement to carry out an obligation under that agreement. The Escrow Agreement required that the "Seller and [Mr.] Kogan convey to Buyer by Quit Claim Deed their interest in the Proper-

ty[.]" "Seller" in the Escrow Agreement was identified as "IPD Properties, LLC and IPD Sales & Marketing, LLC, International Procurement Development, Inc. ("IPD"), IPD Capital, Inc., IPD Group, Inc., and IPD Financial, Inc." "Kogan" was identified as referring to Mr. Kogan, and "Buyer" was identified as Mr. Scharf. Neither the Escrow Agreement nor the Sinking Fund Agreement obligated Mrs. Kogan to do anything, and those documents did not require that she sign any sort of deed.

The Missouri Supreme Court held in *Dunn Industrial Group, Inc. v. City of Sugar Creek*, 112 S.W.3d 421, 435 (Mo. banc 2003) that "[a]rbitration is a matter of contract, and a party cannot be required to arbitrate a dispute that it has not agreed to arbitrate." The usual rules of contract interpretation control the validity of an arbitration agreement. *Id.* at 428. Non-signatories may by bound to an arbitration agreement in some circumstances, such as where the non-signatory is a third-party beneficiary to a contract with an arbitration clause. *Nitro Distributing, Inc. v. Dunn*, 194 S.W.3d 339, 345 (Mo. banc 2006). In that situation the contract must clearly express the intent to benefit the third party or an identifiable class of which that party is a member, and in the absence of such an express declaration, there is a "strong presumption that the third party is not a beneficiary[.]" *Id.* "[A] mere incidental benefit to the third party is insufficient to bind that party." *Id.*

In theory, Mrs. Kogan could be bound by acts of Mr. Kogan. However, in general "a spouse with a business proprietorship is not an agent for his or her spouse." *Miller v. Horn*, 254 S.W.3d 920, 924 (Mo.App.2008). A spouse can be bound, provided that there is evidence of agency, or in the alternative, of ratification by the spouse. *Id.* "Ratification can occur when a spouse confirms or adopts an agreement with knowledge of its contents." *Id.* In *Cohn v. Dwyer*, 959 S.W.2d 839, 843–44 (Mo.App.1997), a case cited by the Scharf Parties, this Court held that one spouse cloaks the other spouse with apparent authority to act on his or her behalf when the facts and circumstances surrounding the transaction give rise to a logical and reasonable inference that the non-acting spouse empowered the acting spouse to act on his or her behalf. That one spouse customarily permits the other spouse to handle the couple's business transactions is strong evidence that such an inference exists. *Id.* The wife in *Cohn* signed the continuing guarantee of the partnership debt to the bank when it made the loan to the partnership, and she also acknowledged the pledge of additional collateral to the bank pursuant to continuing guarantee agreement. *Id.* at 844. There was also testimony that the plaintiff had conducted business with the couple prior to the partnership and that the wife had customarily permitted her husband to handle business transactions on her behalf. *Id.* We held that the above evidence was sufficient evidence for a reasonable juror to find that the wife had cloaked her husband with apparent authority to act on her behalf. *Id.*

In the present case, there is no such similar evidence, nor is there evidence of ratification by the non-acting spouse, as was the situation in *Cohn*, 959 S.W.2d at 844. We note that the arbitrator found a lack of a cloak of apparent authority, except for Mrs. Kogan's signing the Quit Claim Deed to property that she did not own, which the arbitrator held bound her only as to the Escrow Agreement and Sinking Fund Agreement. The Scharf Parties' reliance on "Attachment 3" to the Escrow Agreement, which is titled "Powers of the Attorney-in-fact" is misplaced.

Attachment 3 purports to include Mrs. Kogan. It is not signed by anyone, and has no place for signatures. There is no evidence that she was aware of its existence when she signed the Quit Claim Deed. The Escrow Agreement is signed by Mr. Kogan, but in his individual capacity and in his capacity as agent of the various IPD companies. He did not sign it as her agent. Regarding the Quit Claim Deed, there is no evidence why she signed the Quit Claim Deed, which contained no reference to the Escrow Agreement, and certainly did not incorporate it by reference.[6] Quit claim deeds are used routinely by people without any intention of binding themselves to other contracts or to cloak another party with apparent authority. The evidence is insufficient to support an inference that by signing the Quit Claim Deed, Mrs. Kogan agreed to the terms of the Escrow Agreement and Sinking Fund Agreement, which included an agreement to arbitrate. Consequently, Mrs. Kogan did not waive her right to appeal the arbitrator's decision based on the language in the Escrow Agreement and the Sinking Fund Agreement.

▮ The Scharf Parties contend that Mrs. Kogan waived any objection to the arbitration proceeding. Arbitration counsel made an oral motion regarding this, which we have set forth above. The Scharf Parties argue that such a motion must be in writing. However they fail to cite to case law from any jurisdiction to support that proposition; rather they refer only to a treatise, 1 Martin Domke, *Domke on Commercial Arbitration* section 22:9

(2007). While it is arguably a better practice to put such a motion in writing, nothing prohibits an oral motion to object to an arbitrator's authority. The citation to *Helmerichs v. Bank of Minneapolis & Trust Co.*, 349 N.W.2d 326, 327 (Minn.Ct. App.1984) is inapposite, as all that case stands for is that an objection must be timely raised before the arbitrator, and cannot be raised for the first time after an arbitration hearing in which the party making the post-hearing objection acquiesced and participated. That Mrs. Kogan's objection to arbitration, via arbitration counsel, was oral does not make it any less of a timely objection. The Scharf Parties state that the only objection made by arbitration counsel was "I don't believe there's any authority over [Mrs. Kogan] not being a party to any of these agreements[,]" and cite to *Masonic Temple of St. Louis v. Farrar*, 422 S.W.2d 95 (Mo. App.1967) and *In re Arbitration Between Halcot Navigation Ltd. Partnership and Stolt–Nielsen Transporation Group*, 491 F.Supp.2d 413 (S.D.N.Y.2007). In both of those cases, the parties acquiesced and participated in the arbitration. Mrs. Kogan did not initiate the arbitration proceedings, she did not acquiesce to the arbitration hearing, and she did not participate in it. Section 435.405.1(5) provides that the court shall vacate an award where "[t]here was no arbitration agreement . . . and the party did not participate in the arbitration hearing without raising the objection[.]" The Missouri statute does not require that an objection to an arbitrator's authority be in writing; rather it even

---

**6.** The Missouri Supreme Court in *Dunn*, 112 S.W.3d at 435, held that a guarantor who is not a signatory to a contract generally is not bound by the arbitration clause in that contract, except where the arbitration agreement is incorporated by reference into the guaranty or performance bond, and mere reference to a contract in the guaranty is not sufficient to compel a party to arbitrate against its wishes. We observe in that case, it was the parent corporation that was the guarantor of one of its subsidiary companies, and despite the close relations between the two companies as parent and subsidiary, the parent company was not bound by the arbitration agreement. *Id.*

permits the party to participate in the proceeding, which Mrs. Kogan did not do, provided that an objection was raised and there was no arbitration agreement.

The Scharf Parties also argue that Mrs. Kogan never objected that the arbitrator "lacked jurisdiction over her." It does not matter that arbitration counsel did not use the word "jurisdiction" when objecting to the arbitrator's authority over Mrs. Kogan. The Missouri Supreme Court recently addressed the concept of jurisdiction in *J.C.W. ex rel. Webb v. Wyciskalla*, 275 S.W.3d 249, 251–54 (Mo. banc 2009). It criticized the overuse and misuse of the term "jurisdiction" as if it were a magic phrase, and pointed out that Missouri courts recognize two types of jurisdiction: personal jurisdiction, which is primarily a matter of federal constitutional law, and subject-matter jurisdiction, which is governed by article V of the Missouri Constitution. *Id.* The Scharf Parties likewise are overusing the magic word "jurisdiction" here. Arbitration counsel sufficiently raised the objection to the arbitrator's authority over Mrs. Kogan in his oral motion, which stated the basis for the motion, namely that Mrs. Kogan did not contractually agree to arbitrate. Point sustained.

■ The Scharf Parties in their jurisdictional statement contend that the Kogan Parties have waived their right to appeal, at least as relates to the Escrow Agreement and the Sinking Fund Agreement, because those agreements provide that the parties waive any right they might have to appeal the arbitrator's decision. Those agreements provide that if there is arbitration, "the decision of the arbitrators shall be binding against all parties and the parties waive any right they might otherwise have to appeal such decision." As the Scharf Parties aver, Missouri permits a party to waive his right to appeal "by express agreement," citing *Winsor v.*

*Schaeffer*, 224 Mo.App. 1220, 34 S.W.2d 989 (1931). The Scharf Parties note that there is some authority from the federal courts that parties may waive the right to appeal arbitration decisions under the FAA, citing *Mactec, Inc. v. Gorelick*, 427 F.3d 821 (10th Cir.2005). The Tenth Circuit qualified its discussion on the waiver of the right to appeal by requiring that while an arbitration agreement may eliminate judicial review by contract, the intent to do so must be "clear and unequivocal." *Id.* at 828, 830. That Court also held that a clause that purports to waive the right to appeal an arbitrator's decision cannot strip the judiciary of the power to review such a decision, although a clause that applies only to an appellate court's review of a trial court's judgment of an arbitrator's award may be acceptable, provided that the intent to waive is clearly and unequivocally expressed in the contract. *Id.* at 828–30. In *Mactec*, the agreement at issue stated that "any judgment upon the award rendered by the arbitrator would be final and nonappealable." *Id.* at 824, 828. We note the observation of the Sixth Circuit that there is "a high bar for the waiver of appealability." *Uhl v. Komatsu Forklift Company, Ltd.*, 512 F.3d 294, 301 (6th Cir.2008). We concur with the Sixth Circuit. The language of the Escrow Agreement and the Sinking Fund Agreement is broad, and would waive any review by any court of the arbitrator's decision, even if there was fraud, corruption, or a manifest disregard of the law. It is not an express agreement that clearly and unequivocally waives the right to appeal to the appellate court. Accordingly, the Kogan Parties did not waive their right to appeal, and we proceed to address the merits of their appeal.

■ In their second point relied on, the Kogan Parties and Mrs. Kogan argue that the trial court erred in entering judg-

ment confirming the arbitration award and denying their joint motion to vacate because of the arbitrator's misconduct and error in refusing to grant the Kogan Parties request for a "brief" postponement of the hearing and thereby substantially prejudiced their rights. Specifically, they claim that their original counsel "withdrew for personal reasons 73 days before the scheduled hearing and new counsel had to prepare for a hearing involving thousands of pages of records and complex contractual agreements and other transactions involving witness [sic] and documents in the United States and Russia[.]" Additionally, the Kogan Parties assert that there were "constant and on-going discovery disputes between the parties and the arbitrator prohibited appellants from taking additional depositions or pursuing further discovery after learning of newly discovered evidence and issues—all of which merited a brief postponement to allow appellants additional time to prepare for the hearing and present a full defense to respondents' claims that resulted in a total award in excess of $18 million."

■■■■ Our review of a trial court's judgment confirming an arbitration award is strictly limited; arbitration is a substitute for litigation, not a mere prelude to it. *CPK/Kupper Parker Communications, Inc. v. HGL/L. Gail Hart*, 51 S.W.3d 881, 883 (Mo.App.2001). The scope of judicial review of arbitration awards is " 'among the narrowest known to the law.' " *Id.* at 883–84 (quoting *Litvak Packing Co. v. United Food & Commercial Workers Local Union No. 7*, 886 F.2d 275, 276 (10th Cir.1989)). This is a policy decision made by Congress and by the legislature of Missouri. *Id.* at 884. The party challenging the arbitration award on appeal bears the burden of proving the invalidity of the award, and is not entitled to a reconsidera-

tion of the merits of the case. *Decker v. Kamil*, 100 S.W.3d 115, 117 (Mo.App.2003).

Both the MUAA and the FAA permit a court to vacate an arbitration award if the moving party establishes that the arbitrator refused to postpone the hearing upon sufficient cause shown such that it substantially prejudiced the rights of a party. Section 435.405.1(4) RSMo 2000 provides that the court shall vacate an arbitration award upon application of a party where:

> The arbitrators refused to postpone the hearing upon sufficient cause being shown therefore or refused to hear evidence material to the controversy or otherwise so conducted the hearing, contrary to the provisions of section 435.370, as to prejudice substantially the rights of a party;

The FAA has a similar provision in 9 U.S.C. section 10(a)(3). The only Missouri case interpreting the issue of a failure to postpone under section 435.405.1(4) is *Cacheris v. Mayer Homes, Inc.*, 969 S.W.2d 876 (Mo.App.1998), which is of limited utility where the issue turned on the finding that the party requesting the one day postponement due to a change in attorneys was not prejudiced, as it was in fact represented by the same attorney who had handled the matter from the beginning of the dispute, and there was no prejudice shown. There are a number of cases in the federal courts on this issue. The 8th Circuit has held that "[c]ourts will not intervene in an arbitrator's decision not to postpone a hearing if any reasonable basis for it exists." *El Dorado School District No. 15 v. Continental Casualty Co.*, 247 F.3d 843, 848 (8th Cir.2001). In that case the arbitrator did not give specific reasons for denying the motion for a postponement. *Id.* Looking at the record, the 8th Circuit held that the arbitrator might have determined that postponement was inappropriate because the parties had expended con-

siderable time, effort, and money based on the set hearing dates, because of the arbitrator's own schedule, or because the appellant's attorney made an insufficient showing that he could not attend any of the scheduled three-day hearing. *Id.* It went on the hold that "any or all of these explanations would provide a reasonable basis for the decision not to postpone." *Id.* The arbitrary denial of a reasonable request for postponement may serve as a basis for vacating an arbitral award, but a reasonable basis for the denial will not. *See Sheet Metal Workers International Association Local Union No. 420 v. Kinney Air Conditioning Co.,* 756 F.2d 742, 746 (9th Cir.1985). Under 9 U.S.C. section 10(a)(3), for a party to succeed in vacating an arbitration, the party must establish not only that there was no reasonable basis for the arbitrator's refusal to postpone the hearing, but also that the party suffered prejudice because of that refusal. *Sungard Energy Systems Inc. v. Gas Transmission Northwest Corp.,* 551 F.Supp.2d 608, 613 (S.D.Tex.2008). In *Sungard,* the federal district court noted that the purpose of arbitration is to serve as a quick and informal alternative to litigation, and found that the arbitration panel might have decided to deny the party's requested continuance "to ensure that arbitration served its intended purpose." *Id.*

In the present case, unlike many arbitration cases, the arbitrator set forth multiple reasons for its denial of the Kogan Parties request for a "brief" postponement of three months. The arbitrator noted that the matter had been pending for many months, with a trial date selected by the parties in consultation with the arbitrator that had been set for months. He added that the discovery-related problems were mostly the result of the parties undertaking discovery "at the last, rather than the first, opportunity[,]" that is, the issues were mainly caused by the discovery schedules set by the parties, who knew in general what the issues and matters were when the parties agreed on discovery. He noted that the parties were aware that discovery in arbitration is not subject to the same rules of procedure as in litigation. The arbitrator did not consider Kogan's change in counsel, "under all of the circumstances" to be sufficient reason to postpone the hearing.

■ We note that the purpose of arbitration is to provide a quick, efficient, and less expensive alternative to litigation in the courts. *Group Health Plan, Inc. v. BJC Health Systems, Inc.,* 30 S.W.3d 198, 202 (Mo.App.2000). Any and all of the explanations stated by the arbitrator would provide a reasonable basis for denying the request for a postponement. Accordingly, the trial court did not err in confirming the arbitration award as to the Kogan Parties, and denying the joint motion to vacate the arbitration award. Point denied.

The judgment of the trial court is affirmed as to the Kogan Parties and reversed and remanded in part as to Mrs. Kogan, with instructions to the trial court to vacate the arbitral award against Mrs. Kogan.

ROBERT G. DOWD, JR., and SHERRI B. SULLIVAN, JJ., concur.